UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Deborah May Coutu

     v.                                Civil No. 17-cv-003-JL
                                           Opinion No. 2018 DNH 052
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

# O R D E R

Pursuant to 42 U.S.C. § 405(g), Deborah Coutu moves to
reverse the Acting Commissioner's decision to deny her
application for Social Security disability insurance benefits
("DIB") under Title II of the Social Security Act, 42 U.S.C. §
423. The Acting Commissioner, in turn, moves for an order
affirming her decision. For the reasons that follow, this
matter is remanded to the Acting Commissioner for further
proceedings consistent with this order.

## I. Standard of Review

The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing. The findings of
> the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g). However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'" Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts." Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the [Acting Commissioner] to determine issues of credibility and to draw inferences from the record evidence. Indeed, the resolution of conflicts in the evidence is for the [Acting

Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted). Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam). Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts. That statement[1] is part of the court's record and will be summarized here, rather than repeated in full.

In November of 2013, while Coutu was employed as a supervisor by CVS Pharmacy, she suffered a stroke, and upon admission to the hospital, she was also diagnosed with migraine headaches and cardiovascular risk factors of diabetes and hyperlipidemia. She was out of work from the date of her stroke until some time in February of 2014. In September of 2015, John

---

[1] Document no. 11

Ingalls of CVS wrote a letter in which he described Coutu's
return to work:

> I have worked with Ms. Coutu as her Manager at CVS
> prior to her stroke in November 2013 and after the
> stroke when she attempted to return to work on a full-
> time basis in her prior position as Supervisor.  She
> was unable to perform her supervisory duties and was
> demoted to a part-time Cashier in an effort to
> continue her employment with the company in some
> capacity.
>
> Unfortunately, memory problems, anxiousness, dizzy
> spells [requiring her to lie down] inability to
> complete tasks and deal with stressful situations
> necessitated her transfer to a lower volume store
> where she could not even maintain a part-time schedule
> of 15 hours per week.  Presently, she is working a few
> hours, one day per week in a low volume drug store.
>
> We have provided Ms. Coutu an opportunity to work
> despite her medical conditions.  Unlike all other
> part-time cashiers, she is not required to rotate to
> various stores as staffing requirements demand.  In my
> opinion, Ms. Coutu would not be able to adjust to a
> changing work setting whether it be the specific
> duties she is required to complete or a different
> store than the one she is used to.

Administrative Transcript (hereinafter "Tr.") 250.

In December of 2013, approximately one month after her
stroke, Coutu applied to the Social Security Administration
("SSA") for disability insurance benefits.  She claimed that she
was disabled as a result of her stroke, diabetes, arthritis, and
depression.

The SSA, in turn, referred Coutu to a psychologist for a
consultative examination in March of 2014.  However, because the

resolution of this case does not hinge on the effects of Coutu's mental impairment, there is no need to describe in detail the results of her psychological examination or the state-agency psychological consultant's assessment of her mental residual functional capacity ("RFC").[2]

In April of 2014, a non-examining state-agency physician, Dr. Jonathan Jaffe, assessed Coutu's physical RFC.  He determined that she could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, and push/pull the same amount of weight that she could lift/carry.  He also found that she could both stand/walk and sit (with normal breaks) for about six hours in an eight-hour workday.  With regard to postural activities, Dr. Jaffe found that Coutu could occasionally climb ramps/stairs, balance, stoop, crouch, and crawl, but could never climb ladders/ropes/scaffolds.  He also found that Coutu had no environmental limitations other than a need to avoid even moderate exposure to hazards such as machinery and heights.

---

[2] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

Finally, Dr. Jaffe found that Coutu had no manipulative, visual, or communicative limitations.

The month after her stroke, i.e., in December of 2013, Coutu began treating with a neurologist, Dr. Khawaja Rahman.  In August of 2015, Dr. Rahman completed a Headaches Medical Source Statement in which he indicated that Coutu suffered from moderate migraine headaches that produced the following signs and symptoms:  nausea, mental confusion, inability to concentrate, exhaustion, and increasing pain with activity.  With regard to Coutu's capacity for work, Dr. Rahman opined that she would need to take unscheduled breaks and lie down every day, that she would be off task at least 25 percent of the time, and that she was likely to be absent from work due to her migraines about three days per month.

After the SSA denied Coutu's application at the initial level, she received a hearing before an Administrative Law Judge ("ALJ").  At the hearing, the ALJ posed several hypothetical questions to a vocational expert ("VE").  First, he asked the VE what jobs could be performed by a person with the following characteristics:

> [A]ssume that we have a 63 year old [who was] then 61 year[s] old with a 12[th] grade education and the claimant's work history, has the ability to lift 20 pounds occasionally, 10 pounds frequently, can stand or walk for six hours, sit for six hours, unlimited

use for hands and feet to operate controls to push and
pull, should never climb ladders, scaffolds, or ropes.
The remaining postural are already at occasional and
she should avoid unprotected heights.  And I would add
to that that she [can] handle, understand, and
remember and carry out one to three step instructions
during the typical two hour periods of a normal eight
hour work day and 40 hour work week.  She may be
slower than the average, but [can work] at an
acceptable pace.  And can tolerate occasional changes
in routine or tasks.

Tr. 53.  The VE testified that a person with those

characteristics could perform Coutu's prior work as a cashier.

But, when the ALJ changed the hypothetical to cover a person who

"would [be] off task 25 percent of the day or more and would be

likely to miss three days per month," id. at 54, the VE

testified that no work would be available to such a person.

   After Coutu's hearing, the ALJ issued a decision that

includes the following relevant findings of fact and conclusions

of law:

   2.  The claimant has engaged in substantial gainful
   activity since November 21, 2013, the alleged onset
   date (20 CFR 404.1571 et seq.).

   . . . .

   3.  The claimant has the following severe impairments:
   osteoarthritis, diabetes mellitus, status post
   cerebrovascular accident, coagulation disorder, and
   affective disorder (20 CFR 404.1520(c)).

   . . . .

   4.  The claimant does not have an impairment or
   combination of impairments that meets or medically

equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . . .

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she should never climb ladders, ropes, [or] scaffolds, but can perform the remainder of the postural activities on an occasional basis. She should avoid exposure to unprotected heights. The claimant can understand, remember, and carry out 1-3 step instructions during typical two-hour periods of [an] eight-hour workday and 40-hour workweek. She may be slower than the average worker, but [can] still work at an acceptable pace. She can tolerate occasional changes in routine work tasks.

. . . .

6. The claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

Tr. 16, 17, 19-20, 27. According to the ALJ, Coutu was not disabled, and thus not entitled to benefits, because she: (1) had engaged in substantial gainful activity during the period when she claimed to have been unable to work due to her

disability; and (2) was capable of performing her past work as a
cashier.

## III. Discussion

### A. The Legal Framework

To be eligible for disability insurance benefits, a person
must:  (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question
in this case is whether the ALJ correctly determined that Coutu
was not under a disability from November 12, 2013, through
November 4, 2015.

To decide whether a claimant is disabled for the purpose of
determining eligibility for DIB, an ALJ is required to employ a
five-step process.  See 20 C.F.R. § 404.1520.

> The steps are:  1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5)
> if the [claimant], given his or her residual
> functional capacity, education, work experience, and

age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20
C.F.R. § 416.920, which outlines the same five-step process as
the one prescribed in 20 C.F.R. § 404.1520).

The claimant bears the burden of proving that she is
disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She
must do so by a preponderance of the evidence.  See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

[i]n assessing a disability claim, the [Acting
Commissioner] considers objective and subjective
factors, including: (1) objective medical facts; (2)
[claimant]'s subjective claims of pain and disability
as supported by the testimony of the claimant or other
witness; and (3) the [claimant]'s educational
background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

B. Coutu's Claims

Coutu claims that the ALJ erred by:  (1) finding that after
her stroke, she never went for at least 12 months without
engaging in substantial gainful activity; (2) failing to
properly evaluate the medical-opinion evidence; and (3) failing
to properly assess the credibility of her statements about her

symptoms.  Respondent argues that she need not address Coutu's first claim because even if the ALJ did err in determining that Coutu was not entitled to DIB because she had engaged in substantial gainful activity at a time when she claims to have been disabled, he correctly determined that her RFC permitted her to perform her past work as a cashier.  The court does not agree; this case must be remanded because the ALJ did not properly evaluate the medical-opinion evidence, and the Acting Commissioner effectively concedes that the ALJ erred at step 1.

Turning to the ALJ's evaluation of the medical-opinion evidence, the applicable regulations require ALJs to evaluate all of the medical opinions that are presented to them.  See 20 C.F.R. § 404.1527(c).  Those regulations further establish that, as a general rule, opinions from treating sources should be given the greatest amount of weight,[3] opinions from sources who have examined but not treated a claimant should be given lesser weight, and opinions from sources who have neither treated nor examined a claimant should be given the least amount of weight. See 20 C.F.R. § 404.1527(c)(1)-(2).  That said, an "ALJ may give

---

[3] Indeed, if a medical opinion from a treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record, [the SSA] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

little weight to a treating source's opinion if that opinion 'is inconsistent with other substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.'" Therrien v. Berryhill, No. 16-cv-185-LM, 2017 WL 1423181, at *5 (D.N.H. Apr. 21, 2017) (quoting Glynn v. Colvin, No. 16-CV-10145-LTS, 2017 WL 489680, at *2 (D. Mass. Feb. 6, 2017)).

When weighing any medical opinion, an ALJ should consider: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the medical source who provided the opinion; and (6) other factors. Finally, when explaining the amount of weight that he gives to the opinion of a treating source, an ALJ must "give good reasons." 20 C.F.R. § 404.1527(c)(2). Moreover,

> [t]o meet the "good reasons" requirement, the ALJ's reasons must be both specific, see Kenerson v. Astrue, 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (citation omitted), and supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010). In sum, the ALJ's reasons must "offer a rationale that could be accepted by a reasonable mind." Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing Lema v. Astrue, C.A. No. 09–11858, 2011 WL 1155195, at *4 (D. Mass. Mar.

21, 2011), report and recommendation adopted by 2012
WL 1676984 (D.N.H. May 14, 2012).

Jenness v. Colvin, No. 15-cv-005-LM, 2015 WL 9688392, at *6

(D.N.H. Aug. 27, 2015).

In his decision, the ALJ reported that Dr. Rahman, Coutu's

treating neurologist, had opined that Coutu "would need to take

unscheduled breaks daily in order to lie down and would be of[f]

task 25% or more of the workday [and] would be absent about

three days per month." Tr. 21-22. He continued:

> I have considered this opinion and Dr. Rahman's status
> as a treating provider, but find that this opinion is
> entitled to little weight overall as it is not well
> supported by or consistent with the evidence of
> record. Treatment notes, clinical examinations, and
> daily activities do not support the opinion that the
> claimant requires unscheduled breaks daily or that she
> would be off task 25% or more of the workday, as is
> further discussed below.

Tr. 22. Later on in his decision, the ALJ echoed his earlier

evaluation of Dr. Rahman's opinion:

> As noted above, I give little weight to the opinion of
> Dr. Rahman as his opinion is not well supported by or
> consistent with the evidence of record. Treatment
> notes do not show that the claimant's condition have
> [sic] as limiting an effect on her functioning as he
> described. The most recent notes reflect that the
> claimant's reported headaches, which were less intense
> to second visit [sic; but in both visits the claimant

had normal neurological examination findings and
normal vision examination findings.

Tr. 26.

Sandwiched between the two evaluations of Dr. Rahman's
opinion in which the ALJ actually addressed some of the factors
identified in the regulations, there is this:

> With regard to the claimant's treating physician
> opinions, the undersigned finds that such are not
> entitled to controlling weight.  The possibility
> always exists that a doctor may express an opinion in
> the effort to assist a patient with whom he or she
> sympathizes for one reason or another.  Patients can
> be quite insistent and demanding in seeking supportive
> notes or reports from their physicians, who might
> provide such a note in order to satisfy their
> patients' requests and avoid unnecessary
> doctor/patient tension.  While it is difficult to
> confirm the presence of such motives, they are more
> likely in situations where the opinion in question
> departs substantially from the rest of the evidence of
> record, as in the current case.

Tr. 25.

While there are good reasons not to give controlling weight
to a treating source's opinion, see Therrien, 2017 WL 1423181,
at *5, it would seem beyond cavil that a treating source's
status as a treating source is not one of them.  Moreover, it
can hardly be doubted that when the SSA adopted the rule that it
would "give more weight to medical opinions from [a claimant's]
treating sources," 20 C.F.R. § 404.1527(c)(2), those who drafted
and adopted the rule understood that treating physicians might

14

have sympathy for their patients, and that understanding is necessarily "baked into" the rule.

While there is no need to belabor the point, this court has already registered its discomfort with the kind of unsupported speculation about treating-source sympathy to which the ALJ gives free rein in his decision.  See Meldrem v. Colvin, No. 16-cv-156-JL, 2017 WL 2257337, at \*3 n.9 (D.N.H. May 23, 2017) (citing Halla v. Colvin, No. 15-cv-30021-KAR, 2016 WL 234802, at \*5 (D. Mass. Jan. 20, 2016); Gagnon v. Colvin, No. 1:15-cv-273-DBH, 2016 WL 403063, at \*4 (D. Me. Jan. 13, 2016)).  And this court is far from alone in finding such speculation to be unpersuasive and decidedly unhelpful.  See, e.g., Sunshine v. Berryhill, No. 16-cv-446-LM, 2018 WL 582576, at \*5 n.6 (D.N.H. Jan. 29, 2018) (citing Hill v. Astrue, Civ. No. 12-30018-KPN, 2012 WL 5830707, at \*4 (D. Mass. Nov. 15, 2012)); George v. Colvin, Civ. No. 13-10810-TSH, 2016 WL 8710428, at \*9 (D. Mass. Sept. 30, 2016) (citing Gonzalez v. Astrue, Civ. No. 11-30201-KPN, 2012 WL 2914453, at \*3 (D. Mass. July 5, 2012); Rodriguez v. Astrue, 694 F. Supp. 2d 36, 43 (D. Mass. 2010)).  In short, it is sufficient to say that the court is entirely unmoved by

the ALJ's ad hominem suggestion of bias on the part of Coutu's treating sources.

Turning to the ALJ's other reasons for discounting Dr. Rahman's opinions, they too fall short. To begin, they tend to be fairly unspecific. For example, the ALJ says that Dr. Rahman's opinion is not supported by Coutu's daily activities, "as further discussed below," Tr. 22, but his subsequent discussion of Coutu's daily activities is scant, at best, and appears to be limited to Coutu's report to one doctor that she was walking three times per week for exercise, see Tr. 24, and her report to another health-care provider that she was "staying busy at home with decorating, reading, and visiting with family," id. What is missing from the ALJ's "discussion" is any indication of how Coutu's ability to walk three times a week, decorate her home, read, and visit with family undercuts or contradicts Dr. Rahman's opinion that she would need daily unscheduled breaks to lie down, would be off task 25% or more of the workday, and would be absent from work three days per month, all as a result of her migraines. Moreover, there is no evidence in the record that Coutu took walks, decorated her home, read, or visited with her family without significant interruptions from migraine symptoms or that she performed those activities in a manner that came anywhere close to approximating

the demands of full-time employment.  Thus, the ALJ's
explanation straddles the line between being unspecific and
unsupported.

The ALJ's determination that Dr. Rahman's opinion is
unsupported by or inconsistent with his treatment records is
similarly infirm.  While the ALJ noted that during Coutu's two
most recent visits with Dr. Rahman, she "had normal neurological
examination findings and normal vision examination findings,"
Tr. 26, he does not explain how those findings undermine or
contradict Dr. Rahman's opinion, nor does he say what kind of
neurological examination findings would be necessary to support
an opinion such as the one that Dr. Rahman gave.  In addition,
the office notes from Coutu's two most recent visits to Dr.
Rahman:  (1) include reports of daily headaches associated with
dizziness; (2) show that at each visit, Dr. Rahman increased
Coutu's dosage of amitriptyline,[4] which he first prescribed for
her in December of 2013; and (3) indicate that on several
occasions, Coutu had gone to the emergency room for treatment of
headaches accompanied by dizziness.  The foregoing information
from Dr. Rahman's treatment notes, only some of which is

_____

[4] Amitriptyline hydrochloride is "[a] chemical compound of
the tricyclic antidepressant class that can be used to treat
some sleep disorders and neurogenic pain syndromes."  Stedman's
Medical Dictionary 63 (28th ed. 2006).

reported in the ALJ's decision, does not seem unsupportive or inconsistent with his opinion.

Finally, notwithstanding the ALJ's blanket statement that Dr. Rahman's opinion "is not well supported by or consistent with the evidence of record," Tr., 22, 26, the ALJ says nothing about one important piece of record evidence: John Ingalls' letter describing Coutu's attempt to return to work. In his decision, the ALJ says: "I do recognize that the claimant has decreased her hours at work, but I do not find that the medical evidence of record supports a restriction to part-time work." Tr. 25. The ALJ's statement makes it appear as if Coutu reduced her hours at work, but her hearing testimony and the Ingalls letter -- both of which are uncontroverted -- demonstrate that it was CVS who reduced Coutu's hours, and that it did so several times because it determined that she was capable of neither full-time work nor even 15 hours a week of part-time work.

The fact that CVS, rather than Coutu, reduced Coutu's work hours aligns this case with Armstrong v. Astrue, No. 10-cv-196-SM, slip op. at 30-32 (D.N.H. Feb. 28, 2011) ECF No. 23, R. & R. approved with modifications by ECF No. 26, in which the court ordered a remand because the ALJ determined that the claimant had the mental RFC to perform his past relevant work as a grocery bagger, despite the fact that he had been fired from his

18

bagger job as a result of his inability to follow various work rules due to a mental impairment.  While this case might not be on all fours with Armstrong, the ALJ's failure even to mention the Ingalls letter and his misidentification of the entity responsible for reducing Coutu's hours at CVS, in conjunction with the lack of any meaningful analysis of record evidence that purportedly contradicts Dr. Rahman's opinion, precludes the court from determining that the ALJ's decision to discount Dr. Rahman's opinion is supported by substantial evidence.  Given the VE's testimony that a person with the limitations expressed in Dr. Rahman's opinion would be incapable of any kind of work, this case must be remanded.

### IV. Conclusion

For the reasons given, the Acting Commissioner's motion for an order affirming her decision[5] is denied, and Coutu's motion to reverse that decision[6] is granted to the extent that the case is remanded to the Acting Commissioner for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).  The clerk of

---

[5]Document no. 13.

[6]Document no. 9.

the court shall enter judgment in accordance with this order and
close the case.

**SO ORDERED.**

_____
Joseph Laplante
United States District Judge

Dated:  March 13, 2018

cc:   Karl E. Osterhout, Esq.
      Daniel W. McKenna, Esq.
      T. David Plourde, AUSA